**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ELMER DARNELL ROBERSON,** | ) |
| | ) |
| **Plaintiff,** | )     **Civil Action No. 13-1619** |
| | ) |
| **v.** | ) |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **ACTING COMMISSIONER OF** | ) |
| **SOCIAL SECURITY,** | ) |
| | ) |
| **Defendant.** | ) |

## OPINION

### *I. Introduction*

Pending before this Court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the claims of Elmer Darnell Roberson ("Plaintiff" or "Claimant") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381 et. seq. (2012). Plaintiff argues that the decision of the Administrative Law Judge ("ALJ") should be reversed or remanded because the ALJ failed to properly evaluate Plaintiff's mental impairments, the ALJ failed to develop the record at the hearing, the ALJ failed to assess the Plaintiff's Physical Residual Functional Capacity ("RFC"), and the ALJ failed to take into consideration Plaintiff's obesity. For these reasons Plaintiff asserts that the ALJ's decision to deny benefits was not supported by substantial evidence as required by 42 U.S.C. § 405(g) [See generally ECF No. 12].

To the contrary, Defendant argues that the record was fully developed under the law, and the ALJ properly reviewed all of the evidence. Despite the functional limitations identified by the

ALJ, the Vocational Expert ("VE") was able to present representative occupations which showed Claimant could perform in a gainful occupation and, therefore, the ALJ's decision should be affirmed. The parties have filed cross motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

For the reasons stated below, the Court will grant the Plaintiff's Motion for Summary Judgment affirming. In turn, the Court will deny the Defendant's Motion for Summary Judgment.

## II. *Procedural History*

On April 23, 2010, Plaintiff filed an application for SSI and DIB alleging disability beginning April 22, 2010 (R. at 29). The claim was initially denied on September 9, 2010 (R. at 29). On November 12, 2010, Claimant filed a written request for a hearing (R. at 29). A hearing was held before an Administrative Law Judge on January 20, 2012 (R. at 29). Charles M Cohen, Ph.D., an impartial Vocational Expert, also appeared during the hearing (R. at 29). The Claimant chose to appear and testify *pro se* (R. at 29). On March 23, 2012, the ALJ, Guy Koster, determined that Plaintiff was not disabled under Sections 1614(a)(3)(A) of the Social Security Act (R. at 39). The ALJ stated that, "Based on the testimony of the vocational expert, I conclude that, considering the claimant's age, education, work experience, and residual function capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. at 39). On April 13, 2012 Plaintiff submitted a timely written request for review by the Appeals Council (R. at 25). The Appeals Council denied Plaintiff's request for review thus making the Commissioner's decision final under 42 U.S.C. § 405(g) (R. at 1-5).

### III. Medical History

Plaintiff's is a 50 year old man and approximately 5'9" tall weighing up to 300 pounds [ECF No. 16 at 22]. He graduated from high school in 1984 and completed technical training as a Patient Care Technician. He worked as a housekeeper for a cleaning company from 1983 to 2010 (R. at 187-188). The ALJ found the Claimant to have the following severe impairments: (1) Hypertension; (2) degenerative disc disease of the lumbosacral spine; (3) osteoarthritis; (4) asthma; (5) history of right rotator cuff tear and repair; (6) history of pulmonary hypertension; (7) major depressive disorder; (8) bipolar disorder; (9) psychotic disorder; and (10) substance abuse (cannabis) in remission (R. at 31). In his Disability Report Plaintiff reports that he is mentally depressed because he is hearing voices, having thoughts of hurting people and of hurting himself (R. at 178). He also states, "I feel like I'm [sic] losing my mind. I can read but don't understand what I read." (R. at 178).

Plaintiff describes a typical day as the following: "I wake up through the night with shoulder, neck, and headaches. My days start off [sic] with taken [sic] my meds for high blood pressure and chest pain then I eat breakfast. Also forgot to mention lower back pain. I take little walks when I can other than that not too [sic] much." (R. at 197). The Plaintiff indicates that he and his wife take their grandchildren to the park as long as he can sit on a bench (R. at 198). His wife prepares the meals, though he can prepare frozen dinners (R. at 199). Plaintiff asserts he can walk short distances but cannot walk up hills (R. at 199). He says he needs help tying his shoes and putting on his clothes (R. at 199). Plaintiff is still able to drive (R. at 200). Plaintiff states he does not handle stress well (R. at 203). Plaintiff claims that his conditions affect lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and using hands (R. at 202).

Plaintiff reports he receives treatment from Therapist Nancy Ritsko at Homestead House for his conditions of hearing voices, mind racing, and panic attacks (R. at 179). Plaintiff reports treatment from Patrick J. McMahon, MD, for his rotator cuff tear, clavicle injury, and pinched nerves (R. at 190). Dr. Jeannette South-Paul is Plaintiff's primary care physician ("PCP") (R. at 191). Plaintiff reports the following medications: Lisinopril for his heart, Naprozen for his pain (R. at 180), Hydroclorothiazide for his heart, and Percocet for pain (R. at 190).

On December 4, 2007 Plaintiff presented to UPMC Mercy with right knee pain and swelling for the past 4 days with no related trauma (R. at 228). He was prescribed Vicodan for severe pain, and was to continue with nonsteroidal anti-inflammatory medications ("NSAID"). He was referred to an orthopedic doctor or his PCP for follow up (R. at 230).

On February 16, 2008 Plaintiff visited UPMC Mercy Hospital with complaints of 3 days of throbbing right foot pain and swelling (R. at 228). Plaintiff was diagnosed with acute gouty arthritis. He was discharged with outpatient follow up and should continue with NSAIDs (R. at 228).

On September 29, 2009 Plaintiff presented to UPMC Braddock Emergency Room with acute chest pain and was admitted to the hospital (R. at 248). Plaintiff had an x-ray performed on his chest (R. at 237). The findings of the x-ray were unremarkable (R. at 237). On the same day Plaintiff had a CT scan of his head/brain without contrast due to headache and hypertension to evaluate for intracranial hemorrhage (R. at 238). The CT was unremarkable with the exception of diffuse paranasal sinus disease (R. at 238). Plaintiff also had a NM Cardiology Cardiac Stress Test (R. at 240). The test was terminated because of fatigue and there was no induced chest pain. The test concluded with findings of normal functional capacity (R. at 240).

On September 30, 2009 Plaintiff underwent a Radiopharmaceutical Administration. The Cardiolite SPECT study revealed a small area of apical ischemia. In the short-axis projection there was perfusion defect involving the basal portion of the anteroseptal wall and also inferior wall whereas in the horizontal long-axis projection there was no significant perfusion defects evident and therefore, this may be artifactual. The resting gated scans revealed mild diffuse hypokinesis with left ventricular ejection fraction of 45% (R.at 367). Plaintiff had a cardiology consult with Aiysha Chatha, MD regarding his chest pain and hypertension (R. at 245). Plaintiff was placed on hydrochlorothiazide and amlodipine to control blood pressure. He also was placed on topical nitrates and baby aspirin (R. at 246). Plaintiff was discharged on October 1, 2009 (R. at 251).

On October 12, 2009 Plaintiff underwent an Echocardiogram which showed the following: Dilated left ventricle with mild hypertrophy; diffusely hypokinetic left ventricle with left ventricular ejection fraction of about 45%; mildly dilated left atrium; mild pulmonary hypertension with peak pulmonary systolic pressure of 39 mmHg – there is mild tricuspid insufficiency; and there is Doppler evidence for mild diastolic left ventricular dysfunction (R.at 366).

October 16, 2009 Plaintiff had a follow-up visit with Dr. South-Paul. Plaintiff complains of intense headaches since starting his new medications, a sore sternum, and difficulty breathing when he walks around after meals (R. at 332). Several laboratory tests were ordered, however, it was determined that complaints may be attributable to eating habits.

December 11, 2009 Plaintiff returned to Dr. South-Paul's office for a recheck/routine visit (R. at 326). The main health concerns are urinary frequency and obesity (R. at 328).

Medications prescribed were: Timethoprim-Sulfamethoxazole, Hydrochlorothiazide, Lisinopril, Isosorbide Mononitrate, Aspirin, Pseudoephedrine, and Tramadol (R. at 329).

January 22, 2010 Plaintiff had a routine office visit with Dr. South-Paul. Plaintiff complained of back and shoulder pain related to a fall on the ice that occurred about a year before. He hadn't had any treatment for the pain (R.at 320). The Doctor prescribed the following medications: Naproxen, Hydrochlorothiazide, Lisinopril, Isosorbide Mononitrate, Aspirin, Pseudoephedrine, and Tramadol (R. at 322).

On April 8, 2010 Plaintiff had his initial visit with orthopedist, Dr. Patrick McMahon and said he had fallen on the ice and described a constant sharp pain and numbness in his shoulder and collar bone, tingling in the fingers, and pop/crack/clicking sounds (R. at 284). Dr. McMahon's assessment was bursae and tendon disorders shoulder region unspecified, intervertebral disc degeneration cervical (R. at 291). The Doctor prescribed pain medication of Percocet and a follow-up with MRI and x-ray (R. at 291).

On April 12, 2010 JRMC Diagnostic Services performed a cervical MRI to address Plaintiff's neck pain (R. at 281). The findings were a mild C5-C6 and to a lesser extent C6-C7 degenerative disc disease (R. at 281). The final impression was: Areas of moderate to advanced neural foraminal narrowing; mild to moderate central canal stenosis at the C6-C7 level due to posterolateral disc osteophyte causing moderate lateral recess narrowing and mild abutment of the cord along with advanced right neural foraminal narrowing, moderate to advanced neural foraminal narrowing elsewhere in the cervical spine (R.at 282).

On April 12, 2010 a MRI of the right shoulder was performed and the impression was a 1 cm full-thickness tear supraspinatus tendon, mild AC degenerative change, and intramuscular ganglion (R. at 283).

On April 22, 2010 Plaintiff visited Dr. McMahon due to neck pain, right shoulder loss of movement, pain and weakness (R. at 279). The report stated that pain is alleviated by NSAIDs and Tylenol (R. at 279). Plaintiff described his neck pain as an aching pain, occurring intermittently and mild in severity (R. at 279). Plaintiff rated his shoulder pain similar to his neck pain but as moderate in severity (R. at 279). Dr. McMahon's assessment was intervertebral disc degeneration (Cervical) and Sprains and Strains Supraspinatus (muscle)(tendon). The Doctor stated that Plaintiff's neck seems to be his primary problem (R. at 280). On this same date Doctor McMahon performed a subacromial space injection on Plaintiff's right shoulder and the procedure was tolerated well (R. at 280).

On May 17, 2010 Plaintiff saw Dr. Thomas D. Kramer for neck and right shoulder pain with no incidental trauma or injury (R. at 269). X-rays of the cervical spine revealed anterior osteophytes at C5-6 and an MRI report of the right shoulder showed a full thickness 1 cm tear. MRI study also showed disc osteophyte complexes at C6-7 as well as that of C5-6 (R. at 269). Plaintiff's diagnosis was a rotator cuff tear of the right shoulder and cervical foraminal stenosis secondary to disc osteophyte complex (R. at 269). Arthroscopic surgery and repair were recommended (R. at 269). Plaintiff was referred back to Dr. McMahon.

Dr. McMahon provided a June 10, 2010 letter that requested Plaintiff be excused from work from April 15, 2010 to October 31, 2010 due to illness/injury (R at 264). On this same date Dr. McMahon saw Plaintiff due to complaints of neck pain, right shoulder loss of movement, pain, and weakness (R. at 264). Dr. McMahon's assessment was sprain/strain and intervertebral disc degeneration at the cervical spine (R. at 266). Plaintiff was deemed temporarily disabled from April 15, 2010 to May 17, 2010 (R. at 267).

On June 25, 2010 Plaintiff visited his PCP, Dr. South-Paul to obtain clearance for his rotator cuff surgery (R. at 253-4). His listed medications were Nitroglycerin SL, Hydrochlorothiazide, Lisinopril, Isosorbide Mononitrate, Aspirin, Naproxen, Pseudoephedrine, and Tramadol (R. at 254). A chest x-ray was performed with normal findings (R. at 258, 296).

On July 9, 2010 Plaintiff underwent surgery for right shoulder arthroscopy and rotator cuff repair with an arthroscopic technique, right shoulder subacromial decompression, right shoulder distal clavicle resection, and right shoulder debridement of superior labral fraying (R. at 392).

July 15, 2010 Plaintiff returned to Dr. McMahon complaining of severe right shoulder pain after surgery. Pain is only controlled by narcotic medication (R. at 398). An x-ray revealed a flat acromial undersurface (type 1) and a distal clavicle resection (R. at 397). The Doctor prescribed Oxycodone for pain (R. at 398). On July 22, 2010 Dr. McMahon provided a letter that said the Plaintiff may return to light duty work (R. at 396).

The record contains one report of Plaintiff's physical therapy on October 5, 2010 with Centers for Rehab Services at which time he was discharged (R. at 479, 482). On October 7, 2010 Plaintiff returned to Dr. McMahon complaining of right shoulder pain. Plaintiff described pain as aching and sharp but mild in severity. It is aggravated by movement and was moderately alleviated by physical therapy (R. at 480). The Doctor prescribed pain medications but noted improvement in recovery (R. at 480).

On October 27, 2010 Plaintiff attended an initial mental health assessment at Turtle Creek Valley MH/MR because of depression and anger issues (R. at 499-513). Plaintiff reported he is depressed almost every day. He feels hopeless, useless, and worthless. He has sleep disturbance (R. at 507). Plaintiff's emotional expression was blunt, restricted, and flat (R. at

509).  The DSM Diagnosis by Karen Moeller, PC was Bipolar Disorder, Psychotic Disorder, and Anxiety Disorder (R. at 511).  The summary provided that Plaintiff has mood swings and suicidal and homicidal thoughts.  It also states he was abused as a child and may have post-traumatic stress disorder (R. at 513).  Treatment recommendations were:  individual therapy, symptoms management group once a week, and psychiatric appointments as scheduled (R. at 513).

August 19, 2010 Plaintiff attended an office visit with Dr. McMahon still complaining of right shoulder pain rated as moderate in severity, aggravated by movement, and alleviated by pain medication.  The Doctor ordered the sling to be discontinued and prescribed physical therapy and oxycodone (R. at 483).

December 8, 2010 Plaintiff and his wife attended a psychiatric appointment with Manohar Shetty.  Dr. Shetty said Plaintiff was vague about his history but stated he was depressed, had racing thoughts, sleep disturbances, anhedonia, irritability, anger, and agitation (R. at 514).  She also described Plaintiff as depressed, dysthymic, dysphoric, anxious, restricted affect, and vague.  She stated he had suicidality with no intent or plan, auditory hallucinations, paranoia, suspicion, and command hallucinations (R. at 515).  Plaintiff's diagnosis was bipolar disorder, psychotic disorder, and anxiety disorder, major depressive disorder, recurrent, severe with psychotic features specify:  Mood-congruent (R. at 516, 524).  It was recommended that Plaintiff submit to an inpatient hospital stay because of the severity of his depression.  He declined inpatient hospitalization and requested medication (R. at 517).  Plaintiff was prescribed Depakote 1000 mg and Risperdal 2mg and a follow up appointment was requested in 3 weeks if not sooner (R. at 517).

January 24, 2011 Plaintiff saw Jason Confino, MD for a cardiac consult. Plaintiff's cardiac symptoms of exertional chest pain and shortness of breath have been increasing over the past year (R. at 574). Plaintiff's ECG shows sinus rhythm with inferior anterolateral ST-T changes that could be compatible with ischemia. Prior ECGs have been similar. The study also revealed left ventricular hypertrophy with stage II diastolic dysfunction. Plaintiff's medications were appropriate and a left heart catheterization was scheduled to rule out coronary disease. Symptoms could be due to hypertensive heart disease. Plaintiff's blood pressure was poorly controlled (R .at 575). On February 2, 2011 Plaintiff underwent cardiac catheterization with no significant results (R. at 638).

March 7, 2011 Plaintiff had a chest study (left and a right heart catheterization) performed which came out normal and there were no changes since the September 29, 2009 study (R. at 566). Plaintiff also underwent a Pulmonary Function Test where a mild restrictive pattern was found. A significant bronchocilator response was elicited. The normal diffusing capacity was consistent with chronic bronchitis or asthma (R.at 633).

March 22, 2011 Plaintiff had a mental status exam. He had missed an appointment and again was recommended for inpatient hospitalization, which he and his wife declined (R. at 526). He was dysphoric and his condition appeared unchanged from the last appointment. He was prescribed Periactin for sleep as well as Depakote and Risperdal (R.at 526).

May 6, 2011 Plaintiff saw Dr. South-Paul for back pain and gout. Patient was counselled on the importance of medication but also on weight loss and exercise (R.at 554).

On May 20, 2011 Plaintiff underwent a sleep study where he was diagnosed with obstructive sleep apnea (R. at 624). He was prescribed with a sleep device (R. at 624).

July 22, 2011 Plaintiff had x-rays performed of his feet and lumbar spine. There was mild osteoarthritis of the first MTP joint and minimal multilevel anterior osteophytosis of the lumbar spine. Otherwise, there was no acute osseous abnormality (R. at 615).

On July 26, 2011 Plaintiff had a mental status exam with Dr. Shetty. It was reported that this was his third psychiatric visit and during the last two visits it was strongly recommended that he be hospitalized and the recommendation was repeated at this appointment (R. at 522-23). There were no medication changes at this time.

August 12, 2011 Plaintiff saw Morcos W. Habib, MD for his low back pain caused by bending and lifting that radiates down the legs (R. at 551). Plaintiff was sent for an MRI to assess the lower back pain (R. at 551).

August 24, 2011 MRI of lumbar spine was performed on Plaintiff. Mild to moderate degenerative changes in the lower lumbar spine were found, predominately due to facet arthropathy. This finding combined with congenitally short pedicles results in moderate spinal canal narrowing worst at L3-4 and moderate bilateral neural foraminal narrowing that is worst at L3-4 and L4-5 (R. at 610). X-rays of Plaintiff's feet found no unusual findings with the exception of mild osteoarthritis on the first MTP joint of the right foot (R. at 611).

Plaintiff was treated at Matilda Theiss Health Center from September 15, 2011 to October 4, 2011. His chief complaint was back pain and gout. Plaintiff reported experiencing numbness in the left leg with prolonged sitting (R. at 545). Upon examination there is tenderness on LS Spine and limited flexion (R. at 546). Plaintiff was sent to consult with physical therapy, a pain clinic, and a social worker. Plaintiff was diagnosed with spinal stenosis and was given a refill for Vicodin. He was also prescribed an increase in Allopuinol to 300 mg for his gout (R. at

547-8). According to the notes, Plaintiff stated his back pain is worsening. However, he has not followed previous orders to attend physical therapy or a pain clinic (R. at 548).

November 29, 2011 Plaintiff had an office-visit with Dr. South-Paul. His complaints consist of depression and back pain. Plaintiff claims his back pain is restricting his life (R. at 664). Dr. South-Paul counselled Plaintiff on the importance of follow-up with medications and the pain specialist (R. at 666).

On January 4, 2012 Plaintiff saw Haibin Wang, MD at the Pain Clinic about his low back pain. The Doctor instructed Plaintiff to consult with his PCP regarding weight management (R. at 659). During examination Plaintiff exhibited pain with facet loading and back extension/rotation (R. at 662). Doctor Haibin recommended LESI or LL3 TFESI first for his radicular pain; for his facet pain may consider bilateral MBB L3, 4,5 as second step. The Plaintiff started on Flexeril, Neurontin, Mobic with antacid, Percocet 5-325. The Doctor will also provide a referral for physical therapy (R. at 663). Plaintiff continued to see Dr. Wang for pain control on the following dates: February 2, 2012, March 1, 2012, March 28, 2012, and April 26, 2012 with treatment consisting of medications and injections (R. at 845-885).

On August 16, 2013 a diagnostic psychiatric evaluation was performed on Plaintiff at the Western Psychiatric Institute and Clinic (R. at 7). This service was provided by Daniels Maritza, LSW. Plaintiff stated he was anxious, depressed, and cannot sleep. He would like to be able to communicate with others without becoming anxious and suspicious (R. at 7). The report indicates he was hospitalized in 1998 and 2000 at Western Psychiatric Institute. The report indicates that his hygiene was good but his affect was flat throughout the session and he often

has to be redirected (R. at 10). The evaluator said Plaintiff's memory and insight and judgment is impaired (R. at 10). He was assigned a GAF score of 55 (R. at 15).[1]

### IV. Summary of Testimony

September 3, 2010 Plaintiff met with Dr. Marc Laufe, M.D. for evaluation to be sent to Jason Rasefske, MD at the Bureau of Disability Determination (R. at 414-15). Dr. Laufe completed a Medical Source Statement of Plaintiff's ability to perform work-related physical activities. This evaluation was tainted by the fact that Plaintiff had just undergone shoulder surgery. Dr. Laufe reported no limitations on sitting or standing (R. at 416). Pushing was limited in upper extremity (R. at 416).

A Physical Residual Functional Capacity Assessment (RFC) was completed on September 7, 2010 and noted the impairments of rotator cuff tear, chronic neck pain and hypertension and pulmonary hypertension. The results of the Physical RFC were: Plaintiff can occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds (R. at 422). He was determined to be able to stand or walk with normal breaks for about 6 hours in an 8-hour work day (R.at 422). He can push or pull with limitation in upper extremities (R. at 422). The report indicates that he can perform most postural positions but can never crawl (R. at 423). He is limited in reaching all directions and handling (R. at 423). The evaluator, Dr. Paul Fox states:

> The claimant has described daily activities that are significantly limited. This is consistent with the limitations indicated by other evidence in this case. The record reflects significant gaps in his treatment history. He does not attend physical therapy. He saw his surgeon on only one occasion postoperatively, and was cleared to return to work in light capacity as of 7/22/2010. Of critical importance in determining the credibility of the claimant's statements regarding symptoms and effects on his functioning were his medical history, type of treatment he received, his response to the treatment he received and reported

---

[1] The GAF scale, devised by the American Psychiatric Association, ranges from zero to one hundred and is used by a clinician to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-R). The greater the number the higher the functioning of the individual.

observations of the claimant in the file. Based on the evidence of record, the claimant's statements are found to be partially credible. (R. at 426-27).

On September 23, 2011 Plaintiff's PCP, Dr. South-Paul, wrote a medical statement regarding the Social Security Disability claim. She stated that Plaintiff has recurring low back pain attributable to mild to moderate facet arthopathy, moderate bilateral neural foraminal narrowing (R. at 532). Her diagnosis was mild to moderate degenerative changes of lower lumbar spine. His treatment was physical therapy and analgesics. Dr. South-Paul stated his work capacity is part-time (R. at 532). His medications at the time were Amiodipine, Hydrocodone Acetaminophen, Allipurinol, Lisinopril, Aspirin, Hydrochlorothiazide, Indomethacin, Fluticasone, and Albuterol Sulfate (R. at 531). Dr. South-Paul stated that Plaintiff can frequently lift 10 pounds and occasionally lift 20 pounds (R. at 534). He can stand and walk less than 2 hours (R. at 534). He can sit less than 6 hours (R. at 534). The Plaintiff experiences fatigue and requires rest periods during the day (R. at 534). She says his pain is moderate and he may need to elevate his legs occasionally during an 8-hour work day (R. at 534). The statement further stated that Plaintiff is limited in his lower extremities and he has occasional postural limitations (R. at 536).

At the hearing the ALJ presented to the Vocational Expert the following limitations for consideration:

> I'm going to ask you, sir, to assume a person of the same age, education, past, relevant work history as the claimant with the following limitations: Perform work at the light exertional level with only occasional balancing – occasional climbing, balancing, stooping, kneeling, crouching, and crawling. I'm going to say no climbing of ropes, ladders, or scaffolds. . . . If the person were limited to standing and walking two hours in an eight hour day an sitting a total of six hours in an eight hour day, but would need – but could still lift 10 to 20 pounds, 10 pounds frequently, 20 pounds occasionally. . . in addition, [that person] would be limited to performing unskilled work in a stable environment defined as those jobs involving very simple, routine, repetitive tasks involving one or two steps,

little independent decision making, and only occasional contact with coworkers and supervisors without intense supervision, and must also avoid large groups of people? . . . [Finally, that] person [would have] to elevate their legs [below the waist] occasionally in an eight hour work day. Would that person be able to perform past relevant work? (R. at 95, 96, 97-98, 99).

The VE said the Plaintiff would not be able to perform past relevant work but suggested that Plaintiff could work at light inspector jobs, light packing jobs, and light assembly jobs which are available in sufficient numbers in the economy (R. at 96-97). The ALJ took the evaluation one step further and asked what would be the VE's answer if such an individual with all limitations that were posed for Plaintiff would also be off-task or likely to miss work 15 percent of the time? The VE responded that such a hypothetical person would not be capable of performing any type of work in the national economy (R. at 101).

## V. Standard of Review

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. See 42 U.S.C. § 405(g)(2012). This Court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. See id. "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. See id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry). To determine whether a finding is supported by substantial

evidence, however, the district court must review the record as a whole. See 5 U.S.C. § 706(1)(F) (2012).

### *VI. Discussion*

Under SSA, the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ..." 42 U.S.C. §§ 416(i)(l); 423(d)(1)(A); 20 C.F.R. § 404.1505 (2012). A person is unable to engage in substantial activity when:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled under SSA, a five-step sequential evaluation process must be applied. See 20 C.F.R. § 404.1520; McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows: At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two. See 20 C.F.R. § 404.1520(a)(4)(i). At step two, the Commissioner must determine whether the claimant has a severe impairment. See id. at § 404.1520(a)(4)(ii). If the Commissioner determines that the claimant has a severe impairment, she must then determine whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, subpart p, Appx. 1. § 404.1520(a)(4)(iii). If the claimant does not have impairment which meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or

impairments prevent him from performing her past relevant work. See id. at § 404.1520(a)(4)(iv). If so, the Commissioner must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering his residual functional capacity and age, education and work experience. See id. at § 404.1520(a)(4)(v); see also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000). In this case, the Commissioner uses the sequential evaluation process and determines at step (5) that the Plaintiff has not met his burden of proof that he cannot work in some capacity in the national economy. Because the Plaintiff was determined able to perform work that exists in significant numbers in the national economy, he was determined ineligible for benefits by the ALJ (R. at 39).

Plaintiff bears the burden of proving that his RFC or limitations are that which do not allow for any work in the national economy. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Matthews v. Eldridge, 424 U.S. 319, 336 (1976). Moreover, the ALJ is not required to uncritically accept Plaintiff's complaints. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d Cir. 2011). The ALJ, as fact finder, has the sole responsibility to weigh a claimant's complaints about his symptoms against the record as a whole. See 20 C.F.R. §§ 404.1529(a), 416.929(a).

### a. *Physical Disability*

With regard to Plaintiff's physical impairments, we find that the evidence of record does not support a finding that Plaintiff is disabled under SSA. Plaintiff has a history of low back pain, rotator cuff injury and surgical repair, gout, hypertension, and obesity as indicated by the record in its entirety.

Dr. Marc Laufe performed a consultative examination shortly after Plaintiff's rotator cuff surgery in July of 2010 and his findings were not convincing of Plaintiff's claim of disability.

17

Dr. Laufe reported no limitations on sitting or standing (R. at 416). Pushing was limited in upper extremity (R. at 416), which would be an obvious limitation shortly after shoulder surgery.

The physical RFC, recorded almost a year earlier on September 7, 2010 listed rotator cuff tear, chronic neck pain, and hypertension and pulmonary hypertension as alleged impairments. The Medical Consultant Dr. Paul Fox, in the physical RFC, found Plaintiff to have some limitations in areas of physical ability. His most severe restrictions were: Plaintiff can occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds (R. at 422); Plaintiff is able to stand or walk with normal breaks for about 6 hours in an 8-hour work day (R.at 422); Plaintiff can push or pull with limitation in upper extremities (R. at 422). Furthermore, the report indicated that he can perform most postural positions but can never crawl (R. at 423). He is limited in reaching all directions and handling (R. at 423). Of course, we must consider these limitations in light of the fact the Plaintiff had just undergone rotator cuff surgery two months earlier and still was in the recovery stages. Dr. Fox found Plaintiff's statements regarding his impairments to be partially credible (R. at 427).

Since the reports of Drs. Laufe and Fox Plaintiff's back pain appears to be getting progressively worse. On August 24, 2011 Plaintiff had an MRI of lumbar spine which indicated mild to moderate degenerative changes in the lower lumbar spine resulting in moderate spinal canal narrowing which was worst at L3-4. There was also a moderate bilateral neural foraminal narrowing that is worst at L3-4 and L4-5 (R. at 610). Indeed, Plaintiff indicated that he was only comfortable lying down and needed the assistance of a wheelchair to go shopping. Most recently Plaintiff has been undergoing injections and new medications to deal with low back pain. However, there is no medical record submitted by a doctor to substantiate or support Plaintiff's

claims and we don't have any medical testimony as to whether the new treatment is addressing Plaintiff's pain. Furthermore, the recent MRI only indicated mild to moderate changes.

In her September 23, 2011 letter, Plaintiff's PCP, Dr. South-Paul reported slightly greater limitations for Plaintiff than Drs. Laufe and Fox but still indicated that Plaintiff could work part-time. Her evaluation took into consideration Plaintiff's low back pain is the most recent report on record commenting on Plaintiff's ability to work.

With regard to the Plaintiff's medical issues of gout and obesity, we did not see any evidence of record either from Plaintiff's testimony, or the medical reports of physicians, that would indicate that either of these two conditions inhibit would inhibit Plaintiff's ability to work. Plaintiff's gout was intermittently mentioned as causing the Plaintiff pain but as far as the record indicated the gout was not a permanent condition that would cause a determination of disability and was being treated successfully with medication. Plaintiff's obesity was mentioned as a cause of Plaintiff's ongoing symptoms which needed to be addressed by Plaintiff, but never once was Plaintiffs obesity mentioned as a condition affecting his ability to work.

Based on the evidence of record, we find Plaintiff's physical impairments of rotator cuff injury and surgical repair, gout, hypertension, and obesity to all be either transient/healed, adequately controlled by medicine, or a non-issue with regard to disability. As for Plaintiff's low back pain and degenerative disc disease, we find that the medical evidence is not supportive of a determination of disability. Given the limitations set forth in the RFC, as well as the most restrictive limitations that the ALJ gathered from Dr. South-Paul, which the ALJ presented to the VE at the hearing, the VE was able to list numerous job options in the economy existing in significant numbers for which the Plaintiff was qualified despite his physical limitations.

Therefore, we find that the Plaintiff has not met his burden of proving that he has a physical impairment that is so severe that it prevents him from performing any work.

### b. *Mental Disability*

Plaintiff has a mental disability diagnoses of: (1) major depressive disorder; (2) bipolar disorder; (3) psychotic disorder; and (4) substance abuse (cannabis) in remission (R. at 31). In his Disability Report Plaintiff states that he is mentally depressed because he is hearing voices, having thoughts of hurting people and of hurting himself (R. at 178). He also states, "I feel like I'm [sic] losing my mind. I can read but don't understand what I read." (R. at 178). Plaintiff also stated that he is hearing voices and having suicidal and homicidal thoughts due to his depression (R. at 178, 513).

On October 27, 2010 Plaintiff attended an initial mental health assessment at Turtle Creek Valley MH/MR because of depression and anger issues (R. at 499-513). Based on the reports on the record that were provided, the mental health professionals recommended a course of treatment of: individual therapy, symptoms management group once a week, and psychiatric appointments as scheduled (R. at 513). On three different occasions during appointments it was recommended to Plaintiff to submit to inpatient hospitalization for his depression and on all three occasions he (and his wife) declined hospitalization and opted for medication. Plaintiff was prescribed Periactin for sleep as well as Depakote and Risperdal (R.at 526). Despite the medication, the reports indicated that Plaintiff's mental condition remained unchanged.

Plaintiff objects to the fact that the ALJ formulated his own mental RFC based on the reports provided. However, under the regulations, it is the ALJ who has the exclusive responsibility for making an RFC determination "based on the medical evidence, and he is not required to seek a separate medical opinion." Mays v. Barnhart, 78 F.App'x 808, 813 (3d. Cir.

20

2003). While we do not object to the ALJ formulating his own RFC, we find that the ALJ's conclusions with regard to the Plaintiff's mental health claim are not supported by substantial evidence of record. It concerns us that Plaintiff was recommended for hospitalization on three occasions and that he has suicidal and homicidal thoughts. We feel these concerns are not addressed by the record and Plaintiff's Brief in Support of Motion for Summary Judgment indicates that indeed the ALJ could have obtained more mental health treatment records to further develop the record [ECF No. 12 at 7-8]. We also concur with Plaintiff that given his *pro se* status at the hearing we believe that the ALJ erred when not evoking further testimony from Plaintiff with regard to his mental disability claims. Therefore, we find that the Commissioner lacks substantial evidence of record to support her finding that Plaintiff is not disabled due to a mental impairment.

### VII. Conclusion

For the foregoing reasons, we conclude that the record lacks substantial evidence supporting the determination that Plaintiff is not mentally disabled. Plaintiff's Motion for Summary Judgment is granted and Defendant's Motion for Summary Judgment is denied.

An appropriate order will be entered.

Date: __7-2.4, 2014__

Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc:     counsel of record

21